# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# CHARLESTON DIVISION

| | |
|---|---|
| United States of America, ) | |
| ) | |
| v. ) | Criminal No.: 2:09-684-PMD |
| ) | |
| Koorosh Dashtianpoor Roach, ) | |
| ) | **Order** |
| Defendant. ) | |
| _____) | |

Before the court is Defendant's motion to suppress drugs and a firearm seized by the North Charleston Police Department from Defendant's person during a traffic stop. A hearing was held on this motion.

## BACKGROUND

On May 1, 2009, members of the North Charleston Police Department's Intelligence Lead Police Unit conducted surveillance of a residence located at 4251 Britton Court based on an informant's tip that Defendant was selling heroin. Originally, police intended to execute a search warrant for a residence located at a different address, in part related to Defendant, but refrained from taking such action after learning that Defendant was potentially operating out of 4251 Britton Court instead. Prior to conducting the surveillance, all of the officers of the surveillance team were briefed on Defendant's activities and given a chance to review photographs of him, then the officers, including a canine unit, positioned themselves in the area of the Britton Court residence. While conducting their surveillance, officers observed Defendant at the home, as well as several vehicles that arrived at the house, but only stayed for a short period of time before leaving.

Detective Foster testified that he positioned himself across the street and in front of the Britton Court residence and witnessed three vehicles arrive and leave from the home. First, a

green Ford Ranger arrived at the residence, and Detective Foster witnessed Defendant exit the residence and approach the driver's-side window. The interchange between Defendant and the passengers in the Ford Ranger lasted approximately two minutes, which Detective Foster believed to be a common action for narcotics activity, and he radioed the Ranger's license tag number to other officers positioned in the area. Another set of officers eventually stopped the vehicle and discovered heroin in the car. The driver informed the officers that he bought the drugs from "Dash," who the officers knew to be Defendant. As a result of this information, Detective Foster continued his surveillance of the home, and the next vehicle to approach the Britton Court residence was a Toyota Camry. When it pulled into the residence, Defendant exited the house and got into the car. Detective Foster testified that the vehicle proceeded to the back of the subdivision and came back to drop Defendant off, all within approximately two minutes. Detective Foster also believed this activity to be consistent with narcotics activity, and he radioed the Camry's license tag number to other officers in the area. After stopping the Camry, a drug dog sniffed the vehicle and registered a positive reaction, although no heroin was found. Detective Foster testified that a third car later arrived at the house, a Chrysler Lebaron convertible, and the driver entered the Britton Court residence only for a brief period of time and then left. Because the other officers in the area were occupied with traffic stops for the first two vehicles, none were available to stop the Lebaron.

After the third vehicle departed the subdivision, Defendant noticed Detective Foster across the street and approached him. Because he thought his cover was blown, Detective Foster left the scene and had Detective Hudson replace him. Detective Hudson assumed the same position and testified that a green Honda Passport pulled into the residence, at which time Defendant exited the house and got into the front passenger's seat. She relayed this fact to the

officers in the surrounding areas, as well as information about the vehicle, Defendant's attire, and a general description of the driver and other passenger in the car. Officers Kruger and Bernum received Detective Hudson's transmission, and from a location nearby the Britton Court residence, they identified the Honda Passport and Defendant as the front-seat passenger. The officers followed the vehicle and observed Defendant throwing a cigarette butt out of the car's window. This observation led the officers to turn on their blue lights to initiate a traffic stop for littering.

The vehicle turned into a convenience store, and as soon as the vehicle stopped, the driver quickly exited the vehicle and walked away from it, leaving his car door open. Officer Bernum ordered him to stop and directed him back to the vehicle. While Officer Bernum focused his attention on both the driver and the backseat passenger, Officer Kruger approached the passenger's side of the car and recognized Defendant as matching the descriptions provided. He observed Defendant with his body stretched out, as the lower-half of Defendant's body was off of the seat. He also observed Defendant reaching behind him and into his pants and waistband area, alternating between his right and left hand. Upon seeing this behavior, Officer Kruger drew his weapon and opened up the backseat door to the vehicle. Both officers ordered Defendant to show his hands, and both officers testified that Defendant initially complied with the order by raising his hands, but then, in an aggressive motion, brought them back behind his body to the areas of his waistband and pants. Officer Kruger ordered Defendant to show his hands again, and Defendant, again, initially raised them, but then immediately brought them back down to the areas of his waistband and pants. Officer Kruger testified that this pattern of behavior continued several more times before Defendant finally complied with his commands.

Officer Kruger then ordered Defendant to exit the vehicle, at which Defendant voluntarily stated something to the effect that, "Search me. I have nothing on me." Once out of the vehicle, Officer Kruger began to conduct a patdown of Defendant's person; however, Officer Kruger testified that despite the fact that he asked Defendant to place his hands on the vehicle and spread his legs Defendant continued to bring his hands down to his waist and placed his elbows by his waistband. Moreover, Defendant kept his body close to the vehicle and would not step away from it. Because of this behavior, Officer Kruger placed Defendant in handcuffs and told Defendant he was taking such action for his safety. Officer Kruger conducted a quick patdown of Defendant's chest and pockets, and when nothing was discovered, he passed Defendant off to Officer Bernum. Officer Kruger then poked his head into the front passenger's seat of the vehicle to see if he could see anything, but saw nothing. While Officer Kruger looked into the vehicle, Officer Bernum conducted his own patdown of Defendant and felt a golf ball size bulge in Defendant's buttocks area. Based on his training and experience, he believed the bulge to be drugs, but he did not search Defendant to find out. He did, however, notify a third officer, Officer Pritchard of the NCPD Narcotics Division, that he felt a foreign object in Defendant's pants and believed it to be drugs.

A canine unit arrived to the scene of the traffic stop approximately two minutes after Officers Kruger and Bernum initiated the stop, and at this point, a drug dog was prepared to sniff the vehicle for any narcotics. Officer Kruger stepped away from the vehicle, and the drug dog registered a positive reaction to the front passenger's seat in the vehicle, the seat in which Defendant had been sitting. Defendant was then placed in Officer Pritchard's control, and with the knowledge that a foreign object existed in Defendant's pants and that the drug dog registered a positive reaction to Defendant's seat in the vehicle, Officer Pritchard conducted his own

patdown of Defendant. He too felt the bulge in Defendant's buttocks area and asked Defendant to remove the object. Defendant replied that he could not remove the object with his hands cuffed. Officer Pritchard did not feel comfortable removing the handcuffs, so he proceeded to ask Defendant if what he had in his buttocks area was illegal. Officer Pritchard testified that Defendant nodded his head in a motion that indicated it was.

Officer Pritchard then put on latex gloves and loosened Defendant's belt. He pulled Defendants pants back from the waist and saw a plastic bag sticking out. He reached down, touching only the bag, and pulled the bag out from Defendant's pants. Officer Pritchard testified that at no time did he touch Defendant's buttocks, that at no time did he conduct an anal cavity search of Defendant, and that at no time was Defendant's buttocks exposed to the public. Eleven glassine bags of heroin, with a combined weight of .44 grams, and cocaine base in the amount of .67 grams were found in the plastic bag. The officers then placed Defendant under arrest and walked him to a patrol car. While walking Defendant back to the patrol car, Officer Kruger observed Defendant walking in a strange manner and asked Defendant if anything was wrong with him. Defendant indicated he was fine, and after taking a few more steps, a loaded Lorcin 9 mm pistol fell out of the leg of Defendant's pants. Officer Kruger testified that upon the gun falling out of his pants, Defendant, without questioning, stated that he was not going to shoot any police officers. Officer Kruger asked him how he was able to conceal the weapon during the frisk, and he informed them that he moved it around his waistband with his elbow. Defendant is charged with knowingly possessing a firearm and ammunition while having been convicted of a crime punishable by imprisonment for a term exceeding one year, possession with intent to distribute heroin and crack cocaine, and using and carrying a firearm during and in relation to and in furtherance of a drug trafficking crime.

## ANALYSIS

Defendant seeks to have the evidence of the gun and drugs found on his person suppressed, as he believes the officers' conduct violated his Fourth Amendment rights. He denies ever providing the officer's with consent to search his person, and based on the fact that the officer's did not find any drugs or weapons in the car prior to detaining him, Defendant argues that the officers cannot justify their seizure of him on a reasonable and articulable suspicion that he was armed and dangerous. Designed "to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals," *INS v. Delgado*, 466 U.S. 210, 215 (1984) (internal quotation marks omitted), the Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV; *see Mapp v. Ohio*, 367 U.S. 643, 655 (1961) (holding that the Fourth Amendment is incorporated and applied to the states by the Due Process Clause of the Fourteenth Amendment).

Recently, the United States Supreme Court addressed the authority of police officers to "stop and frisk" a passenger in a motor vehicle temporarily seized upon police detection of a traffic infraction. *Arizona v. Johnson*, 129 S. Ct. 781, 784 (2009). The Court held:

> [I]n a traffic-stop setting, the first *Terry* condition—a lawful investigatory stop—is met whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation. The police need not have, in addition, cause to believe any occupant of the vehicle is involved in criminal activity. To justify a patdown of the driver or a passenger during a traffic stop, however, just as in the case of a pedestrian reasonably suspected of criminal activity, the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous.

*Id.* In this case, the police officers witnessed Defendant toss a cigarette butt out of the vehicle. Therefore, they had probable cause to initiate a traffic stop for littering. *See* S.C. Code Ann. § 16-11-700(A) ("A person, from a vehicle or otherwise, may not dump, throw, . . . or otherwise

dispose of litter or other solid waste . . . upon public or private property or waters in the State including, but not limited to, a highway, . . . road, street, or alley . . . .").

Once a vehicle has been lawfully detained for a traffic violation, it is reasonable for police officers to order the driver out of the vehicle for safety purposes. *Pennsylvania v. Mimms*, 434 U.S. 106, 111–12 (1977). Additionally, an officer may also order passengers out of a car that is subject to a valid traffic stop. *Maryland v. Wilson*, 519 U.S. 408, 415 (1997). Thus, the officers acted within their discretion by asking Defendant to exit the vehicle. Prior to his removal from the vehicle, however, Officers Kruger and Bernum both observed Defendant with his hands behind him in the area of his waistband and pants. In fact, despite repeated requests by both officers for Defendant to show his hands, Defendant continued to keep placing his hands behind him in those areas. Even after Defendant finally complied with the officers' orders and exited the vehicle, Defendant failed to comply with Officer Kruger's patdown instructions, as he continued to bring his hands and elbows down to his waistband area. Based on this behavior, the court finds the officers had reasonable, articulable suspicion to believe Defendant may be armed and dangerous. *Arizona v. Johnson*, 129 S. Ct. 781, 784 (2009); *see also United States v. Hamlin*, 319 F.3d 666, 671–72 (4th Cir. 2003) ("[The officer] had a right to conduct a patdown for concealed weapons because [the defendant's] nervousness and his repeated attempts to reach toward his groin area gave [the officer] reason to believe that [the defendant] was armed and dangerous.").[1]

Defendant also contends that his detention exceeded the justification for the stop, a littering offense, and that police officers may not unnecessarily prolong the detention. While "a lawful seizure can become unlawful if it is prolonged beyond the time reasonably required to

---

[1] The court further finds that the officers' use of handcuffs to restrain Defendant's arm movements did not extend the *Terry* stop into a custodial arrest. *See United States v. Hamlin*, 319 F.3d 666, 671 (4th Cir. 2003) (finding that "the use of handcuffs did not convert [an] encounter into a custodial arrest because the use was reasonably necessary to protect [the officer's] safety.").

complete that mission," *Muehler v. Mena*, 544 U.S. 93, 101 (2005) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)), an officer may detain a driver beyond the scope of a routine traffic stop with "either the driver's consent or a reasonable suspicion that illegal activity is afoot." *United States v. Branch*, 537 F.3d 328, 336 (4th Cir. 1998). In this case, the court finds that the officers did not unconstitutionally prolong the traffic stop. Officer Bernum testified that a canine unit arrived within approximately two minutes after he and Officer Kruger initiated the traffic stop, and the officers used the narcotics-detection dog soon after Defendant exited the vehicle. The use of a narcotics-detection dog is constitutionally acceptable if performed within the time reasonably required to issue a traffic citation, *Branch*, 537 F.3d at 335, and in this case, the court finds that the officers' use of a drug dog did not unnecessarily prolong Defendant's detention. *See also Arizona v. Johnson*, 129 S. Ct. 781, 788 (2009) (finding that an officer's inquiries into matters unrelated to the justification for the traffic stop does not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop); (citing *Muehler*, 544 U.S. at 100–01 (2005)).

Defendant does argue, however, that nothing about the positive alert of the narcotics dog was particularized to him that would have given the officer's probable cause to search him again. Contrary to Defendant's contention, the narcotics-detection dog registered a positive finding on the seat in which Defendant was sitting. This information, coupled with Defendant's hand movements in the vehicle during the traffic stop and the officers' knowledge that Defendant had an abnormal bulge in the buttocks area of his pants, gave the officers probable cause to believe Defendant was hiding narcotics in his pants. Therefore, the court finds that the search of Defendant's pants did not violate his Fourth Amendment protections.

In making this ruling, the court rejects Defendant's final argument that the search of his pants to uncover the contraband violated his Fourth Amendment rights. To support this argument, Defendant relies on several cases, including *United States v. Askew*, 529 F.3d 1119 (D.C. Cir. 2008) and *United States v. Ford*, 232 F. Supp. 2d 625 (E.D. Va. 2002). Without providing a discussion of these cases, the court notes that they present factual scenarios distinguishable from the testimony presented in this case. Unlike *United States v. Askew*, the officers already had probable cause to search Defendant's buttocks area and were not searching him "to determine whether the object of the search . . . had particular incriminating characteristics that would contribute to a probable cause determination." 529 F.3d at 1133. And unlike *United States v. Ford*, Officer Pritchard testified that at no time did he conduct an anal cavity search of Defendant or pull Defendant's pants down in a way that would have exposed his buttocks to the public. *Cf. Ford*, 232 F. Supp. 2d at 631 (granting a motion to suppress after finding that an anal cavity search conduced on a public highway in broad daylight, which exposed the defendant's buttocks to the public, violated the defendant's Fourth Amendment rights). He merely loosened Defendant's belt, pulled Defendant's pants away from his waist, and after noticing a plastic bag sticking out, he simply reached in—touching only the bag—and pulled it out, finding heroin. Again, the court finds that this conduct constituted a lawful search.

Finally, after placing Defendant under arrest, a 9mm pistol hidden in his waistband fell out of his pant legs and into plain view. Since the pistol was in the officers' plain view and its incriminating nature was immediately apparent, Officer Kruger did not violate any of Defendant's constitutional rights by seizing it. *Horton v. California*, 496 U.S. 128, 136–37 (1990) (noting that under the plain view doctrine an object of an incriminating nature may be seized without a warrant so long as the police officer is lawfully present at the scene).

## CONCLUSION

Based on the foregoing, the court **DENIES** Defendant Koorosh Dashtianpoor Roach's motion to suppress.[2]

**AND IT IS SO ORDERED.**

_____
PATRICK MICHAEL DUFFY
United States District Judge

**January 15, 2010
Charleston, SC**

---

[2] In his motion, Defendant also asks the court to suppress any statements made by the Defendant during the traffic stop. The court did not receive any evidence or arguments on this matter at the hearing, and after reviewing the record, the court denies the motion.